In re Samuel G. BIALAC, Debtor.

**HARSH INVESTMENT CORP. and Harsh Building Co., Appellants,**

v.

**Samuel G. BIALAC, Appellee.**

**In re James T. BIALAC, Debtor.**

**HARSH INVESTMENT CORP. and Harsh Building Co., Appellants,**

v.

**James T. BIALAC, Appellee.**

BAP No. AZ 81–1281 EKG.

BAP No. AZ 82–1036 EKG (Consolidated).

BK. No. B–80–2700–PHX–RGM.

Adv. No. 81–0467 RGM.

BK. No. B–81–1221–PHX–RGM.

Adv. No. 81–0466–RGM.

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued June 18, 1982.

Decided Oct. 1, 1982.

Newman R. Porter, Amy R. Coy, Evans, Kitchel & Jenckes, P.C., Phoenix, Ariz., for appellants.

Gerald K. Smith, Lewis & Roca, Phoenix, Ariz., for appellees.

## OPINION

Before ELLIOTT, KATZ and GEORGE, Bankruptcy Judges.

ELLIOTT, Bankruptcy Judge:

The dispute before us revolves around a $1,989,900 promissory note owned by the Bialac family. The debtor, James Bialac, owns one-sixth of the note. Harsh Investment Corporation and Harsh Building Corporation (collectively "Harsh" herein) have a security interest in the note to secure payment of an Arizona state court judg-ment against the Bialacs. Harsh conducted a foreclosure sale of the other five-sixths of the note, honoring the automatic stay as to James' one-sixth interest.

The trial court set aside the foreclosure sale on the grounds that the foreclosure of the five sixths interest in the note, that was not property of the estate, frustrated James' right of redemption of 100% of the note and therefore was a violation of the 11 U.S.C. § 362 stay. See In re Bialac, 16 B.R. 982 (Bkrtcy.D.Ariz.1982) for the opinion of the trial judge. Harsh appeals from that order.

Harsh also appeals from an order entered on Harsh's counterclaim refusing to termi-nate the stay to allow Harsh's foreclosure on James' one-sixth interest in the note.

Samuel Bialac, debtor in a separate Chap-ter 11 case, owned a one-third interest in the note. James Bialac and other Bialac family members, not before the court, owned the balance of the note.

As a result of an order in a prior proceed-ing, Harsh obtained permission to foreclose on Samuel Bialac's one-third interest. That order was affirmed on appeal, In re Bialac, 15 B.R. 901, 8 B.C.D. 564 (Bkrtcy.App. 9th Cir.1981). The foreclosure sale was sched-uled for June 1, 1981.

Minutes before the appointed hour for a foreclosure sale of the note on June 1, 1981, James Bialac filed his bankruptcy petition under Chapter 11. Harsh decided to go ahead with a sale of a five-sixths interest in the note, leaving unforeclosed the one-sixth interested owned by James Bialac. Harsh was the only bidder at the sale and pur-chased the five-sixths interest for $160,000. After crediting the $160,000 to the judg-ment, there was a balance due of approxi-mately $350,000.

In separate adversary proceedings, Samu-el Bialac and James Bialac challenged the validity of the June 1, 1981 sale on the grounds that it was not conducted in a commercially reasonable fashion. James Bialac's complaint also alleged that the sale violated the automatic stay arising from the filing of his petition. The two adversary

proceedings were consolidated. This is a consolidated appeal from two orders of the trial court entered in the consolidated adversary proceedings.

We hold that the June 1, 1981 sale of the five-sixths interest did not violate the automatic stay and reverse the January 29, 1982 decision. We further hold that the trial court did not make findings sufficient to sustain its judgment that the automatic stay should continue as to James' one-sixth interest in the note. Accordingly, we reverse and remand the decision of October 8, 1981.

## I

### VALIDITY OF THE JUNE 1, 1981 SALE

Because neither James nor Samuel Bialac challenged the determination of the trial court that the sale was held in a commercially reasonable fashion, the only issue before the panel regarding the sale is whether the sale of the non-owned five-sixths interest in the note violated the § 362 automatic stay invoked by James Bialac's Chapter 11 petition. Thus, the only issues on appeal are those raised by James Bialac's complaint and Harsh's counterclaim. Harsh argues that because the § 362 stay does not stay actions against codebtors and because the property that was foreclosed was not owned by James Bialac but by other members of his family, the automatic stay did not apply. The argument in response, adopted by the trial court, relies upon the prejudicial effect which sale of the codebtors' property would have on the debtor's ability to exercise his right to redeem property subject to the security interest of the debtor under the Uniform Commercial Code (UCC).

■ After first determining that, under relevant portions of the UCC, James Bialac had a right to redeem all of the property subject to Harsh's security interest (i.e. the entire note) by paying the entire amount owed to Harsh any time prior to the foreclosure sale, the trial court concluded that the sale violated § 362(a)(4). In effect, the trial court ruled that because the foreclosure sale interfered with the right to redeem, it was subject to the stay. We disagree. The boundary must be drawn somewhere and we conclude this sale was beyond the reach of § 362.

Although the parties dispute the proper terminology to be applied to the redemption rights created in this situation, there ultimately appears to be little dispute about the nature of the rights created by state law. It is not clear whether Arizona law or California law applies. The Arizona state courts in earlier litigation between the parties gave effect to a California choice of law provision contained in the documents governing these transactions. The trial court did not decide which applied for present purposes, but rather, decided that under either states' version of the UCC there existed a substantial redemption right. *Compare,* Ariz.Rev.Stat. § 44–3152 *with* Cal. Uniform Comm.Code § 9506. In any event, both sides in this dispute seem to agree that prior to foreclosure, James Bialac had the right to redeem all of the property subject to Harsh's security interest, including the five-sixths interest in the note owned by his family members, by paying the entire amount owing under the judgment. Both parties also seem to agree that should James Bialac have been forced to pay a disproportionate fraction of the judgment in order to redeem the note, he would thereby have obtained an equitable lien on the other family members' interest in the note in order to enforce a right of contribution. James Bialac could then have recovered any excess share of the judgment he was forced to pay by looking first to his codebtors' interest in the note.

James Bialac argues that the redemption right is a valuable property right. He notes, for example, that the right is unwaivable, and is independently alienable both voluntarily and involuntarily. *See* U.C.C. § 9–311; *U.S. Industries Inc. v. Gregg,* 540 F.2d 142, 146 (3d Cir.1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1091 (1977). We agree that the redemption right is an independent property right that becomes part of the bankrupt-

cy estate under § 541; but an analysis of the § 362 stay is required to determine whether Harsh's interference with this right violated the stay.

The scope of the automatic stay is undeniably broad. The trial court reached its conclusion in reliance, in part, upon comments contained in the legislative history to the Bankruptcy Reform Act of 1978 which enacted the present Bankruptcy Code. It quoted pertinent provisions:

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and *all foreclosure* actions .... The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally.

House Report No. 95–595, 95th Cong., 2d Sess. at 340 (1977) (emphasis added by trial court). *See* Senate Report No. 95–989, 95th Cong., 2d Sess. at 54–55 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5840, 6296. In spite of the broad language contained in the legislative history, Congress manifestly did not intend to stay any and all commercial activities that might directly or indirectly affect the debtor or his property. The automatic stay is not a moritorium on commercial activity affecting the debtor; it is a moritorium on certain debt collection and lien enforcement activities directed against the debtor or property of the debtor's estate.

Section 362(a)(4) provides that a petition operates as a stay against, "any act to create, perfect, or enforce any lien against property of the estate." Harsh's foreclosure sale was neither directed against James Bialac's interest in the note nor was it directed at his redemption right—it was not the redemption right that was sold, but rather various codebtors' property. That the potential value of the redemption right may have been reduced by the sale does not transmute the act of enforcing a lien against a third party's property into an act covered by § 362(a)(4).

James Bialac relies extensively upon cases holding that where state law grants a debtor a post-foreclosure right of redemption that § 362 suspends the running of the redemption period. *See, e.g., Matter of Dohm,* 14 B.R. 701 (Bkrtcy.N.D.Ill.1981); *In re Johnson,* 8 B.R. 371, (Bkrtcy.D.Minn. 1981). The trial court considered these authorities and correctly concluded they were not controlling. The issues are distinguishable. The post-foreclosure redemption right existing in some states is conceptually different from the UCC pre-foreclosure redemption right. Johnson and similar cases rely, in part, on the fact that the post-foreclosure right is a right to redeem property owned by the debtor; not a right to obtain a lien on other persons' property. Bialac's attempt to stretch this concept to include the potential that exists to obtain an equitable lien that would arise with respect to property not owned by the debtor upon payment of the total amount owed is simply unpersuasive.

This conclusion is particularly appropriate because the law is clear that apart from the effect caused by the existence of the redemption right, the automatic stay applicable in Chapter 11 does not preclude efforts to collect from a debtor's codebtors, or guarantors, or from their property. *In re Casgul of Nevada, Inc.,* 22 B.R. 65 (Bkrtcy. App. 9th Cir.1982).

Ample power exists under § 105 for the bankruptcy court to enjoin a foreclosure of this sort in the event the equities indicate that there will indeed be material prejudice to the debtor or the estate.

Here it is doubtful that James Bialac has been harmed by the sale. The sale harmed him only to the extent that five-sixths of the note is no longer available upon which an equitable lien might attach for recovery of any disproportionate share of the joint and several judgment that he is ultimately

forced to pay. But, by virtue of the five-sixths interest being foreclosed and sold for $160,000, the other codebtors have made payments in partial satisfaction of the judgment to the full extent of the value of their property. Since James Bialac could have at most obtained an equitable lien on this property in exchange for a disproportionate payment in satisfaction of the judgment, i.e., a lien to reimburse him for a greater than proportional payment of the judgment, he was neither helped nor harmed by the sale if the property was sold for its fair market value.

If the property was sold for less than its fair market value, he is prejudiced only to the extent his ability to obtain contribution from his other codebtors is made more difficult by the loss of the difference between the fair market value of the five-sixths interest and the $160,000 obtained. The potential damage is not realized unless James Bialac is forced to pay a disproportionate fraction of the judgment. Here, the court has made an unchallenged finding that the sale was commercially reasonable. Although a price obtained at a commercially reasonable sale may not be the highest price that might have been obtained, we believe the court's finding further weakens any claim that James Bialac has that the sale materially damaged him.

James Bialac claims he was damaged by the "increase in the redemption price" he now faces. He notes that prior to sale, he could have redeemed the entire note for approximately $460,000, but following the sale he could redeem only one-sixth of the note by paying $300,000. The argument that this "involuntary price increase in the right to redeem" amounts to a violation of the automatic stay is specious. By making the payment, Bialac would not be purchasing the redeemed property, but rather satisfying a judgment. The nature of any potential damage accruing to James Bialac is fully described above. No matter how much the "redemption price" increased, no damage accrued to James Bialac unless the foreclosed interest in the note was sold for less than fair market value and his ability to collect from his codebtors was thereby impaired.

Having concluded that § 362(a)(4) was violated, the trial court fashioned an equitable remedy granting, in effect, a 60 day post-foreclosure redemption right to James Bialac. The exercise of this redemption right was stayed pending appeal. Because we have concluded that the trial court's judgment that the sale violated the automatic stay was error, it is unnecessary to decide whether the equitable remedy it fashioned to redress the violation was an appropriate mechanism. James Bialac argues that even if the automatic stay did not strictly apply, the trial court had ample equitable authority to extend the redemption period past the foreclosure date. We disagree. The equitable powers of the bankruptcy court are not a license to set aside a foreclosure sale not conducted in violation of any law and not voidable by any power of the trustee or the debtor. *See In re Madrid*, 21 B.R. 424 (Bkrtcy.App. 9th Cir.1982). Cases cited by James Bialac to the effect that the bankruptcy court can validly extend an unexpired post-foreclosure redemption period or enjoin, before the fact, a foreclosure sale of a codebtor's property are not to the contrary. They do not support the principle that a valid sale having become final may be set aside after the fact.

## II

### RELIEF FROM THE AUTOMATIC STAY

Harsh sought relief from the automatic stay as to James' one-sixth interest in the note under § 362(d)(2) on the grounds that (1) the debtor did not have an equity in the property, and (2) the property was not necessary to an effective reorganization.

The subject note presented some unique valuation problems. The note represented a portion of the purchase price of an apartment complex and conversion to condominiums. Because the Federal Housing Administration guaranteed financing, and FHA regulations restricted secondary financing,

the FHA required that the purchase money obligations in favor of the seller be evidenced by a special FHA form of note known as a "surplus cash note," which prohibited distributions from the maker's assets other than from surplus cash, as defined by FHA regulations. The surplus cash note was in the principal amount of $1,989,800, with 7% interest accruing, payable only out of surplus cash, with all principal and interest finally due on July 1, 2007.

Extensive testimony by Harsh's expert witnesses showed that, assuming no payment is required before July 1, 2007, the present value of the note amounts to only a tiny fraction of the judgment against James Bialac. In these adversary proceedings and in other adversary proceedings now pending before the bankruptcy court in which James Bialac is joined by other family members, he claims the maker is obligated to make immediate interest payments to the extent surplus cash is available. These members of the Bialac family further accuse Harsh of wrongfully preventing the development of surplus cash and thus wrongfully preventing Harsh from making payments to them. On the basis of these allegations, the Bialacs claim Harsh's expert witnesses were undervaluing the note, inasmuch as interest payments were due much sooner than the experts were asked to assume.

Harsh strenuously argues that the Bialacs' position regarding the due date of interest is an attempt to reopen and relitigate issues determined by the Maricopa County Superior Court in the 1967–1980 litigation. Harsh discounts the Bialacs' argument that the parties could not have intended that the maker be permitted to make no payments until more than 40 years after execution of the note. Harsh readily admits that this was not the intent of the parties, but declares that as a result of and by virtue of the Arizona Superior Court judgment the parties are bound by the terms of the note. Harsh apparently concedes that if the Bialac may enforce interest payments sooner than June 1, 2007, it has not presently shown that there is no equity in the note.

The trial court made no findings determining the value of the note. Rather it held that the note "at present is not precisely quantifiable and has, if nothing else, sufficient potential equity to preclude the lifting of the stay at this time." *Appellant's Excerpt of Record* at 7. The court deferred an ultimate determination on this point pending the outcome of the various adversary claims filed by the Bialac family challenging Harsh's present nonpayment of interest. It then concluded, in light of the "contingent equity posture" of the note, that the note was necessary to an effective reorganization.

■ We believe, without regard to whether there was equity in the note, that the court's finding that the note was necessary for an effective reorganization is clearly erroneous. The court's only reason for finding that the note was necessary to an effective reorganization was the contingent equity in the note. This conclusion ignores the fact that, under the § 362(d)(2), the existence of equity in the property is a distinct condition, the existence of which alone defeats a claim for relief under § 362(d)(2). The note is a passive investment instrument. It does not serve as an essential cog in the business operation of the debtor. Nor is it a consumer asset essential to James Bialac's living. If there is no equity in the note, it can serve no reorganization function. Cases cited by James Bialac only highlight the fact that the only important issue at hand is whether there is equity in the note to be salvaged by a plan. He has suggested no other purpose the note can serve.

We conclude that the court's factual determination of contingent equity in the note cannot sustain its judgment to continue the automatic stay in the face of Harsh's challenge under § 362(d)(2). The court did not find equity in the note existed; it found litigation critical to the determination of equity existed.

To rest the judgment upon the finding of the existence of litigation rather than making a substantive finding regarding the questions at issue in the litigation is simply

586

insufficient. Section 362(d)(2) sets forth grounds for relief which if proven mandate relief from stay. Congress unquestionably intended actions under § 362(d) to provide a summary means of obtaining relief from the automatic stay. See § 362(e) (statutory summary calendaring); § 362(f) (authorization for *ex parte* relief from stay); House Report 95–595, 95th Cong., 2d Sess. at 344 (1977). By continuing the automatic stay without making findings regarding the equity in the property, the court fails to live up to the Congressional mandate to decide the question.

Although the issues facing the trial court in attempting to ascertain the value of the note are complex, it is incumbent upon the court to value the note in order to determine equity, if any, on the basis of the evidence presented to it.

### III

### *CONCLUSION*

The judgment of January 29, 1982 is REVERSED; judgment is to be entered for the appellants. The judgment of October 8, 1981 is REVERSED and REMANDED with instructions that further proceedings be had consistent with this opinion.